1
2
3
4                      UNITED STATES DISTRICT COURT
5                    NORTHERN DISTRICT OF CALIFORNIA
6
7    EVA VIOLAN,                          Case No.  12-cv-05739-WHO
               Plaintiff,
8
         v.                              **ORDER ON MOTION FOR SUMMARY**
9                                         **JUDGMENT**
10   ON LOK SENIOR HEALTH SERVICES,,      Re: Dkt. No. 36
               Defendant.
11

12        Plaintiff Eva Violan worked as a Quality Assurance Associate for On Lok Senior Health

13   Services ("On Lok") from January 31, 2005 until she took leave from the company in February

14   2011 for medical reasons.  Violan asserts that she was discriminated against and has filed a First

15   Amended Complaint (FAC) that alleges causes of action for (1) disability discrimination in

16   violation of the California Fair Employment and Housing Act, CAL. GOV. CODE § 12900 *et seq*.

17   ("FEHA"), (2) disability discrimination in violation of the Americans with Disabilities Act

18   ("ADA"), 42 U.S.C. § 12101 *et seq*.,  ("ADA"), (3) retaliation in violation of Title VII of the ADA

19   (4) retaliation in violation of FEHA, (5) retaliation in violation of CAL. LABOR CODE § 132(a), (6)

20   failure to engage in the interactive process in violation of FEHA, (7) failure to accommodate in

21   violation of FEHA, (8) intentional infliction of emotional distress, and (9) constructive

22   termination.  On Lok has moved for summary judgment on all nine causes of action.

23        For the reasons discussed below, the Court GRANTS in part and DENIES in part the

24   Motion for Summary Judgment.

25                              **BACKGROUND**

26        On Lok is a non-profit organization that provides health care services to elderly individuals

27   in the San Francisco Bay Area.  Defendant's Motion for Summary Judgment ("Mtn.") at 4.

28   Violan worked as a Quality Assurance Associate ("QA Associate") in On Lok's Quality

United States District Court
Northern District of California

Assurance Department ("QA Department").  The QA Department employed two other QA

Associates, Brenda Fisher and Anabela DeSouza.  They report to the QA Department Manager,

Sandra Nunez.  Mtn. at ¶ 4.  The QA Department Supervisor, Dr. Catherine Eng, oversees the

department.  FAC ¶ 17.

The QA Department identifies deficiencies with patient care and implements measures to

correct the deficiencies.  Mtn. at 4.  As a QA Associate, Violan was responsible for gathering and

analyzing data regarding problems with patient care, preparing reports on patient care issues, and

providing data and administrative support for On Lok's Quality Assurance Committees.  Mtn. at

4; Declaration of Andrew Sommer in Support of Motion for Summary Judgment ("Sommer

Decl."), Ex. A at 48:7-50:6.  *See also* QA Associate Job Description, Declaration of Dow Patten in

Support of Opposition to Motion for Summary Judgment ("Patten Decl."), Ex. C.   Violan

prepared reports on issues concerning dental quality, tuberculosis screenings, vaccinations,

medication errors, falls, bruising, patient grievances, and disenrollments, among others.  Sommer

Decl., Ex. A at 35:8-36:23; 40:2-41:2; 175:25-176:19; Declaration of Sandra Nunez in Support of

Motion for Summary Judgment ("Nunez Decl.") ¶ 3.

Violan's responsibilities required regular keyboarding and use of data analysis software

such as Excel spreadsheets.  Nunez Decl. ¶ 3.  Violan testified that she did "a lot of data entry"

and that during a typical day she spent six to seven hours using a computer.  Declaration of Brian

Ito in Support of Defendant's Motion for Summary Judgment, Ex. A at 56:19-23.  She performed

work that did not require use of a computer for about two hours a day, which included making

telephone calls to staff regarding errors, educating staff on proper procedures, handling medical

files, sorting mail, and attending regular meetings.  Sommer Decl., Ex. A at 35:13-36:4; Ito Decl.,

Ex. A at 57:4-20.

On September 17, 2010 Violan experienced pain in her back, arms, and neck while

working at her computer.  Patten Decl., Ex. A at 63:10-64:7.  On September 24, 2010, Violan filed

a workers' compensation claim for a "work-related neck injury" and saw On Lok's workers'

compensation physician.  FAC ¶ 28.  The doctor diagnosed Violan with a right trapezius strain,

bilateral right strain, and muscle spasms.  FAC ¶ 28.  He recommended a modified work schedule

1    limiting keyboarding to 50 percent of her duties, physical therapy, an ergonomic work station, and

2    frequent short stretch breaks.  FAC ¶ 28; Sommer Decl., Ex A at Ex. 7.  On Lok provided these

3    recommended accommodations.  Sommer Decl., Ex. A at 72:21-74:11; 75:10-76:23; Nunez Decl.

4    ¶ 5; Declaration of Deborah Stuart-Middleton in Support of Motion for Summary Judgment

5    ("Middleton Decl.") ¶ 4.

6          On September 30, 2010, Nunez and Eng assigned Violan a data entry project that required

7    "an extensive amount of keyboarding."  FAC ¶ 29.  Violan informed them that she would do her

8    best to complete the assignment by the deadline, but that it was likely not possible due to her

9    injuries and twice weekly physical therapy sessions.  Patton Decl., Ex. F.  On October 18, 2010,

10   Violan reported to Deborah Stuart-Middleton, On Lok's Human Resources Director, that she was

11   feeling stressed about her workload.  FAC ¶ 32; Middleton Decl. ¶ 5.  On Lok again referred

12   Violan to a workers' compensation physician, who diagnosed Violan with "situational anxiety"

13   caused by work-related stress and recommended medical leave.  FAC ¶ 32; Middleton Decl. ¶ 6.

14   Violan went on medical leave from October 25, 2010, to November 2, 2010.  Middleton Decl. ¶ 6.

15         Violan returned to On Lok and worked from November 2010 to January 2011 while

16   restricting keyboarding to 50 percent of her duties.  Middleton Decl. ¶ 6.  Violan had follow-up

17   appointments with her doctors on December 7, 2010, December 21, 2010, and January 18, 2011.

18   The doctors recommended "[f]ull-time work" with the modification of limiting keyboarding to

19   four hours per day.   Patten Decl. Exs. W, X. Y.

20         In late January and early February 2011, the time period shortly before Violan was reduced

21   to part-time, QA Manager Sandra Nunez and Human Resources Director Deborah Stuart-

22   Middleton discussed Violan's work restrictions and determined that it was necessary to reassign

23   some of her job responsibilities to other QA Department staff in order to accommodate her

24   keyboarding restrictions.  Middleton Decl. ¶ 4; Nunez Decl. ¶ 6.  On Lok asserts that "[b]y the end

25   of January 2011, the Quality Assurance Department was unable to continue absorbing all of the

26   keyboarding work that Ms. Violan could not perform, and the Department did not have sufficient

27   other work to fill the remaining 50 percent of her workday."  Mtn. at 7.  *See also* Middleton Decl.

28   ¶ 7; Nunez Decl. ¶ 6.  Dr. Eng told On Lok's Chief Medical Officer, Dr. Cheryl Phillips, that the

United States District Court
Northern District of California

3

United States District Court
Northern District of California

Quality Assurance Department was overwhelmed with its workload.  Declaration of Dow Patten in Support of Plaintiff's Renewed Opposition to Motion for Summary Judgment ("Patten Supp. Decl."), Ex. B ("Phillips Depo.") 36:1-21.

> On January 26, 2011, Phillips wrote an email to Middleton and Eng, stating,
>
> So, as you know Eva V is limited to no more than 50% time of keyboarding. However, her job duties require 90%.  There does not seem to be a change in this restriction that we are aware of and the department is not able to absorb all the remaining work.  At this point I would offer that Eva is no longer able to complete her duties as defined in her position description . . . The QA staff clearly needs to have that 0.5 FTE of missing work force and we have maxed out the existing staff to capacity.

Middleton Decl. Ex. D.  Phillips then wrote, "I would look to Dr. Eng – since it is under her direct supervision, but I would think that if these restrictions do continue that we reduce her time to 50% and bring in a temp." *Id*.  Eng responded, "Before making a decision, I would like to discuss this with Sandra [Nunez] . . . Sandra's input regarding the current QA department workload will be important." *Id*.

Violan visited the workers' compensation doctor for a follow-up appointment on February 1, 2011.  FAC ¶ 34.  The doctor's report recommended "[f]ull-time work," with the additional restriction of limiting keyboarding further to three hours per day.  Patten Decl., Ex. L.  On February 3, 2011, Phillips, Eng, and Nunez met to discuss "modification of responsibilities and work hours" for Violan in light of the new restriction.  Middleton Decl., Ex. D.  They drafted a memorandum outlining their decision to reduce her schedule to part-time.  *Id*.  According to Dr. Eng, the decision to reduce Violan's hours was made for "two reasons, one is the three hour [limitation on keyboarding] and [the other was] that we could no longer have the fifty percent done by other people because other people had their own responsibilities to keep."  Patten Decl., Ex. G at 93:25-94:12.

The record contains conflicting evidence concerning to whom Violan's work was assigned.  According to Dr. Eng, the work was assigned to herself, QA Department Manager Sandra Nunez, and QA Associates Anabela DeSouza and Brenda Fisher.  *Id*. at 94:13-16.  In a declaration, Nunez stated that the work was assigned to Violan's "coworkers."  Patten Decl., Ex. A at 24:13-25.

However, in a later deposition, Nunez testified that only she and Dr. Eng took Violan's work. Declaration of Andrew Sommer in Support of Defendant's Reply to Plaintiff's Supplemental Opposition ("Sommer Supp. Reply Decl."), Ex. B at 25:1-9.

QA Associate Brenda Fisher testified that Violan's restrictions did not overburden others in the QA Department, and that in fact the QA Department was overwhelmed only after Violan went on medical leave. Patten Supp. Decl., Ex. D at 53:17-55:7.

> Q.   Was there a time when Eva was there that you felt that you had too much work to do?
> A.   Not really.
> Q.   Was there a time when Eva was working there and there was discussions [sic] amongst group that there was too much work to do in the QA department?
> A.   I don't remember that discussion.
> [Objection omitted]
> Q.   Did you ever hear anyone say or have any discussion that people couldn't be responsible for doing their own work and Eva's work?
> A.   No.
> Q.   After Ms. Violan left you said you had a lot more assignments.  Was that because you were assigned her work?
> A.    Yes.

*Id*. at 54:16-55:7.

On February 4, 2011, Nunez and a human resources employee, Emily Choi, gave Violan a memorandum titled, "Work modifications for Eva Violan: changes in responsibilities and hours of work." Sommer Decl., Ex. A at Ex 10.  The memo stated,

> Effective February 1, 2011 the work modifications are 3 hours keyboarding per day.  Limited keyboarding causes a major impact on the QA Associate's job responsibilities, therefore, effective February 7, 2011 Eva's QA Associate responsibilities and work hours will be modified as follows:  The regular work schedule will be Monday – Friday 1:30 – 4:30 PM.  On days of the Dental Review Committee . . . the hours of work will be 11:30 – 2:30 PM.

*Id*.  The memo then described Violan's modified duties, which included preparing for committee meetings, performing quality assurance studies, reporting on quality assurance claims for medication errors, bruising, disenrollments, and "[c]lerical duties that require limited keyboarding."  *Id*.  The memo also stated that Violan would receive a hands-free headset and that "communications that ordinarily take place by email should be handled primarily through faxes and phone calls."  *Id*.

1    Nunez read the contents of the memo to Violan "verbatim."  Patten Decl. Ex. AA; Patten

2    Supp. Decl., Ex. F at 91:21.  According to Violan, Nunez and Choi did not explain the contents of

3    the memo, the requirements of the modified work schedule, or the accommodations.  Patten Decl.,

4    Ex. A at 226:7-227:25.

5    Violan emailed Nunez and Choi after the meeting and asked, "[j]ust for clarification, the 3

6    hours everyday is only computer work that I will do, right, nothing else?  No follow-up, etc."

7    Patten Decl., Ex. Z.  Nunez responded, "please refer to the memo."  *Id*.  Nunez then emailed

8    Phillips, Eng, and Choi and stated, "I did not want to mislead [Violan] into thinking this

9    discussion was open for discussion therefore I said your schedule is as indicated in this memo."

10   Patten Decl., Ex. AA.  Near the close of business that day, Nunez dropped off the hands-free

11   headset on Violan's desk without any explanation and returned to her own cubicle.  Middleton

12   Decl., Ex. G.

13   On February 7 and 9, 2011, Violan emailed Middleton regarding her concerns about the

14   memo.  Among other concerns, Violan was worried that (1) the work responsibilities outlined in

15   the memo were the same responsibilities that she was performing full-time with the exception of

16   the clerical duties, which were additional responsibilities on top of her workload; (2) she was

17   required to complete all of her full-time work duties in the condensed three-hour timeframe;  (3)

18   the accommodation of a hands-free headset was not recommended by her doctor and she did not

19   think it was helpful; (4) the accommodation of allowing her to communicate via fax rather than

20   email was unreasonable.  Middleton Decl., Ex. G.   Violan also stated that the modifications and

21   Nunez's behavior made her feel anxious, depressed, and "belittled."  *Id*.  Middleton replied that

22   Violan was not required to complete eight hours of work in three hours, and that she was not

23   required to use the hands-free headset.  *Id*.

24   Violan met with Middleton and Nunez to propose other accommodations.  Patten Decl.,

25   Ex. A at 121:9-124:2.  She asked Middleton whether she could work in other departments, such as

26   the "clinic."  *Id*. at 121:9-122:6.  She also asked Nunez whether she could work in another

27   department, and whether she could perform more work in the QA Department that did not require

28   keyboarding, specifically, "peer review," "pulling out of medical records," and working on

1   committee meetings.  *Id*. at 123:6-124:14.  Nunez told Violan that these accommodations were

2   "not possible" but "she didn't say why."  *Id*. at 124:3-6.

3          On February 15, 2011, Violan requested a three-month medical leave of absence.  On Lok

4   granted her leave request.  Violan requested leave in three-month increments thereafter through

5   June 15, 2012, which were supported by notes from her physicians.  Declaration of Jamie Lau in

6   Support of Defendant's Motion for Summary Judgment ("Lau Decl."), Exs. H, I, L.  On Lok

7   routinely contacted her requesting whether she was able to return to work with or without

8   accommodation.  Her physicians stated that she could not return to work.  Lau Decl. Exs. H, I.

9          On Lok hired a replacement for Violan in early 2012.  Middleton Decl. ¶ 15.  On Lok

10   informed Violan that if she were able to return to work in the future, it would help her identify an

11   available position for which she was qualified, but that if none were identified, she would be

12   terminated.  Middleton Decl. ¶ 15; Lau Decl. Ex L.  Violan is currently on approved medical leave

13   and has not been released by her doctors to return to work.  Sommer Decl., Ex. A at 140:13-141:3;

14   Middleton Decl. ¶ 16.

15                                    **LEGAL STANDARD**

16          Summary judgment is proper "if the movant shows that there is no genuine dispute as to

17   any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

18   The moving party bears the initial burden of demonstrating the absence of a genuine issue of

19   material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however,

20   has no burden to disprove matters on which the non-moving party will have the burden of proof at

21   trial.  The moving party need only demonstrate to the court "that there is an absence of evidence to

22   support the nonmoving party's case."  *Id*. at 325.

23          Once the moving party has met its burden, the burden shifts to the non-moving party to

24   "designate specific facts showing a genuine issue for trial."  *Id*. at 324 (quotation marks omitted).

25   To carry this burden, the non-moving party must "do more than simply show that there is some

26   metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

27   475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient;

28   there must be evidence on which the jury could reasonably find for the [non-moving party]."

United States District Court
Northern District of California

7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)) (internal quotations omitted).  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment."  *Id*.  However, conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly, "uncorroborated and self-serving" testimony that "flatly contradicts [ ] prior sworn statements" cannot create a genuine issue of fact.  *Kennedy v. Applause, Inc*., 90 F.3d 1477, 1481 (9th Cir. 1996).

## DISCUSSION

## I.  FIRST AND SECOND CAUSES OF ACTION: DISABILITY DISCRIMINATION UNDER THE ADA AND FEHA

The ADA prohibits employers from discriminating against any "qualified individual on the basis of disability."  42 U.S.C. § 12112.  Similarly, under FEHA, it is unlawful for an employer to discriminate on the basis of "physical disability."  CAL. GOV'T CODE § 12940(a).  In evaluating discrimination claims under both the ADA and FEHA, courts apply the McDonnell Douglas three-part burden-shifting framework.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 (2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1113 (Cal. 2000).  Under this framework, the plaintiff must first establish a prima facie case of disability discrimination; the burden then shifts to the employer to demonstrate a "legitimate, nondiscriminatory reason" for the challenged action; and, finally, the burden shifts back to the plaintiff to prove that the employer's asserted reason is pretextual.  *Snead v. Metro.*

*Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001).  A plaintiff can prove that an adverse employment action was a pretext for discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

### A.  Prima Facie Case

To establish a prima facie case of disability discrimination under the Americans with Disabilities Act, a plaintiff must show that "(1) she is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability."  *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (alterations omitted).  To establish a prima facie case of disability discrimination under FEHA, a plaintiff must prove that: (1) she suffers from a disability; (2) she is otherwise qualified to do her job; (3) she suffered an adverse employment action; and (4) the employer harbored discriminatory intent.  *Avila v. Cont'l Airlines*, 165 Cal. App. 4th 1237, 1246 (2008).  Because the FEHA provisions relating to disability discrimination are based on the ADA, the state and federal disability claims may be analyzed together in the absence of contrary or different law on a particular issue.  *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1133 n.6 (9th Cir. 2001).

The first element of Violan's prima facie case, whether her injuries qualify as a "disability" under the ADA and FEHA, is undisputed by the parties.  The parties dispute the second and third elements, whether Violan was "qualified" to perform the essential functions of a QA Associate, and whether the decision to reduce her schedule to part-time was an "adverse employment action" motivated by her disability.  In light of the evidence submitted, Violan has raised a genuine issue of material fact that she has a prima facie case of disability discrimination under the ADA and FEHA.

### 1.  Whether Violan was Qualified

Under the ADA and FEHA, a qualified individual is one with a disability who, with or without reasonable accommodation, can perform the essential functions of the job the individual

9

1    holds.  *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (ADA);

2    *Jackson v. Simon Prop. Grp., Inc.*, 795 F.Supp.2d 949, 959 (N.D. Cal. 2011) (FEHA); *see also* 42

3    U.S.C. § 12111(8); Cal. Gov't Code 12940(a)(1).  Violan bears the burden of demonstrating that

4    she can perform the essential functions of the job with or without reasonable accommodation.

5    *Kennedy v. Applause, Inc.*, 90 F.3d 1477 1481 (9th Cir. 1996).  "Essential functions" are

6    "fundamental job duties of the employment position . . . not including the marginal functions of

7    the position."  *Bates v. United Parcel Svc., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (en banc)

8    (internal quotation marks omitted).  Courts consider, among other things, the employer's judgment

9    as to what functions are essential, the amount of time spent performing the function, the

10   consequences of not requiring the applicant or employee to perform the function, and the work

11   experience of current and former employees.  *Id.* at 991.

12           The Court finds that keyboarding is an essential function of the quality assurance associate

13   position.  Violan's colleagues Brenda Fisher, Anabela DeSouza, and her managers Sandra Nunez

14   and Catherine Eng all testified that keyboarding and data entry are necessary to a QA Associate's

15   duties and comprise a substantial part of their work day.  Violan argues that her job description

16   does not set forth a minimum required number of hours of keyboarding and that the job is not akin

17   to a "clerical" position.  Opp. at 4.  *See also* Patten Decl., Ex. C.  While it appears that the job

18   requires analysis beyond mere data entry, the testimony of other QA Department employees

19   demonstrates that the bulk of this analysis was performed using computer programs such as Excel.

20   Patten Supp. Decl., Ex. D at 16:17-24; Patten Supp. Decl., Ex. E at 28:1-29:16.  Further, Violan

21   herself admitted that she spent about six hours per day at the computer.  Ito Decl., Ex. A at 56:19-

22   23.  Therefore, Violan has not created a material issue of fact as to whether keyboarding is an

23   "essential" function of her job.

24           The Court must next consider whether Violan can perform the essential functions of her

25   position "with or without reasonable accommodation."  *Hayes v. Potter*, No. 02-0437, 2005 WL

26   1876070 at *5 (N.D. Cal. Aug. 3, 2005) (denying in part motion for summary judgment on

27   disability discrimination claim even though defendant proved that plaintiff could not perform the

28   essential functions of the position without an accommodation, because defendant failed to

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1  demonstrate an absence of genuine issues of material fact that plaintiff could not perform the

2  essential functions of the position *with* a reasonable accommodation).  While this is a close

3  question, the Court finds that Violan has established a triable issue of fact as to whether she could

4  perform the essential functions of her job with reasonable accommodation.

5      Critically, Violan performed her job duties for approximately three months from

6  November 2010 through January 2011 while limiting keyboarding to 50 percent of her duties.  On

7  Lok suggests that this accommodation was unreasonable, and in support offers the testimony of

8  Sandra Nunez and Dr. Eng, who testified that during this time some of Violan's keyboarding

9  duties were redistributed to other employees and as a result the QA Department was overwhelmed.

10  This evidence is contradicted, however, by the testimony of QA Associate Brenda Fisher, who

11  testified that there was no indication that the QA Department was struggling while Violan was

12  working with the 50 percent restriction.  Aside from Nunez and Eng's contradicted statements,

13  there is no other evidence that the QA Department was struggling to meet its demands or that

14  Violan's restrictions had any other negative impact.

15      In addition, On Lok provides no evidence that Violan's job performance was

16  unsatisfactory during this period.  In fact, Nunez admits that she did not know what duties Violan

17  was performing from November 2010 through January 2011 when she was not using a computer.

18  Nunez Depo. (Patten Decl.) 27:10-24.  *Compare Fernandez v. Ridge*, No. 03-2187, 2005 WL

19  756553 (N.D. Cal. Apr. 4, 2005) *aff'd sub nom. Fernandez v. Chertoff*, 220 F. App'x 675 (9th Cir.

20  2007) (granting summary judgment where defendant produced evidence that plaintiff's carpal

21  tunnel caused her to "fall behind" on work and created a "backlog" in her department).  There was

22  no notice to Violan during this period that she was not performing her job adequately.  That Nunez

23  did not know what non-keyboarding duties Violan performed undercuts the credibility of her

24  declaration, which states that the QA Department "did not have sufficient work to fill the

25  remaining 50 percent of [Violan's] workday."  Nunez Decl. ¶ 6.

26      On Lok cites *Wilmarth v. City of Santa Rosa*, 945 F. Supp. 1271 (N.D. Cal. 1996), which is

27  distinguishable.  In *Wilmarth*, the court found that typing for four hours a day was an essential

28  function of the plaintiff's job, and because "[d]efendant could not have possibly reasonably

United States District Court
Northern District of California

1    accommodated plaintiff's inability to type more than two hours per day such that she could still

2    perform the essential functions of her position." *Id.* at 1279.  Unlike the defendant in *Wilmarth*,

3    On Lok has not established that the QA Associate position, as a rule, required more keyboarding

4    hours per day than Violan was capable of performing.[1]  One view of the facts supports an

5    inference that Violan performed her job sufficiently and without adverse impact on the QA

6    Department while limiting keyboarding to 50 percent of her duties.  Accordingly, On Lok fails to

7    demonstrate an absence of genuine issues of material fact whether Violan could perform the

8    essential functions of the QA Associate position with reasonable accommodation.

9                           **2.  Adverse employment action**

10       Violan contends that she suffered an adverse employment action when On Lok reduced her

11   schedule from full-time to part-time.  The Ninth Circuit "take[s] an expansive view of the type of

12   actions that can be considered adverse employment actions" such that "a wide array of

13   disadvantageous changes in the workplace constitute adverse employment actions."  *Ray v.*

14   *Henderson*, 217 F.3d 1234, 1240, 1241 (9th Cir. 2000).  Adverse employment actions are not

15   necessarily limited ultimate decisions such as hiring, firing, or promotion, but may also include

16   other "intermediate retaliatory actions." *Sabido v. Walgreen's Drugs*, No. 03-2857, 2005 WL

17   522078 at *6 (N.D. Cal. Mar. 2, 2005). "The inquiry as to whether an employment action is

18   adverse requires a case-by-case determination based upon objective evidence." *Id.*

19       A reduction in work hours may constitute an adverse employment action.  *See Ramsey v.*

20   *City of Philomath*, 182 F. App'x 678, 680 (9th Cir. 2006) (reduction in work hours was adverse

21   employment action); *Sanford v. Landmark Prot., Inc.*, 2011 U.S. Dist. LEXIS 52671, 16-17 (N.D.

22   Cal. 2011) (stating that "it is undeniable" that plaintiff "suffered an adverse employment action"

23   where her "work hours were reduced and her pay was cut"); *Hardin v. Wal-Mart Stores, Inc.*, No.

24   08-0617, 2012 WL 691707 (E.D. Cal. Mar. 2, 2012) (reduction in work hours and change in status

25

26   ────────────

27   [1] On Lok asserts that the position required 90 percent keyboarding as described in Cheryl Phillips'
     January 2011 email.  But testimony of On Lok employees, including Phillips herself, weakens the
     assertion that 90 percent was an accepted and accurate estimate.  Patten Supp. Decl., Ex. B at
28   35:12-21; Patten Supp. Decl., Ex. C at 83:20-24, 84:1-7 (stating, "But the specific number of
     ninety percent.  I don't recall that number coming up.").

1    from full time to part time constituted adverse employment action); *Reese v. Barton Healthcare*

2    *Sys.*, 693 F. Supp. 2d 1170, 1183 n.8 (E.D. Cal. 2010) ("plaintiff's schedule was not merely

3    changed . . . her hours were significantly reduced.").

4          At oral argument, Violan's counsel stated that the reduction to part-time reduced Violan's

5    pay.  On Lok has not argued in its briefs or produced any evidence showing that the reduction

6    from full-time to part-time made no significant change in Violan's employment status.[2]  Because

7    the modification significantly changed Violan's work hours from eight to three hours per day and

8    cut her pay, the Court finds that she suffered an adverse employment action.

9          Next, the Court must determine whether there is a causal nexus between the adverse

10   employment action and Violan's disability.  The "ADA outlaws adverse employment decisions

11   motivated, even in part, by animus based on a plaintiff's disability or request for an

12   accommodation--a motivating factor standard."  *Head v. Glacier Northwest Inc.*, 413 F.3d 1053,

13   1065 (9th Cir. 2005).  "[T]he ADA does not require that a discriminatory impetus have been the

14   only motive for an adverse employment action."  *Dark v. Curry Cnty.*, 451 F.3d 1078, 1084-85

15   (9th Cir. 2006).  But, it must "be a motivating factor . . . the forbidden criterion must be a

16   significant reason for the employer's action.  It must make such a difference in the outcome of

17   events that it can fairly be characterized as the catalyst which prompted the employer to take the

18   adverse employment action, and a factor without which the employer would not have acted."

19   *Kilgore v. Tulare Cnty.*, No. 10-0031, 2012 WL 483085 at *8 (E.D. Cal. Feb. 14, 2012).

20         There is ample evidence in the record that Violan's keyboarding limitations motivated On

21   Lok to reduce her schedule to part-time.  Eng testified that the decision to reduce Violan's hours

22   was motivated in part by her keyboarding restrictions.  Patten Decl., Ex. G at 93:8-94:12.

23   Contemporaneous emails from late January and early February 2011 between Nunez, Eng, and

24   Phillips stated that reducing Violan's hours was necessary because of her keyboarding restrictions.

25   Middleton Decl., Ex. G.  This evidence establishes a causal nexus between Violan's disability and

26

27   _____

28   [2] Instead, On Lok argues that the reduction was a reasonable accommodation rather than an
     adverse employment action.  Whether the reduction was a reasonable accommodation is a separate
     issue, discussed in section II below.

On Lok's decision to reduce her schedule to part-time. *See Norris v. Allied–Sysco Food Services, Inc.*, 948 F. Supp. 1418, 1434 (N.D. Cal. 1996) (where employer stated in writing that the reason it terminated plaintiff was her continuing unavailability for work, and reasonable jury could have concluded she was unavailable for work because of her disability, a triable issue existed regarding whether plaintiff's disability was a motivating factor in employer's decision to terminate her). Accordingly, Violan has established that there are triable issues of fact whether she suffered an adverse employment action because of her disability.

### B.  Legitimate Non-Discriminatory Reason and Pretext

Having established a prima facie case, the burden next shifts to On Lok to show that it had a legitimate, non-discriminatory reason for the adverse employment action.  If the employer makes that showing, the burden shifts back to Violan to demonstrate that the reason is a pretext for discrimination.  A plaintiff may demonstrate pretext in one of two ways: "(1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis, Board of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000).  To establish pretext, Plaintiff need only present "very little" direct evidence of a discriminatory motive or "specific and substantial" indirect evidence. *Winarto v. Toshiba America Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001).

On Lok's proffered legitimate, non-discriminatory reason is that the QA Department was overwhelmed by the amount of work that Violan could not complete due to her limited keyboarding abilities.  As detailed above, the evidence in support of this contention is the testimony of Nunez and Eng, which is contradicted by the testimony of QA Associate Brenda Fisher, who stated that the QA Department was not impacted by Violan's restrictions.  This evidence, viewed in the light most favorable for Violan, creates an inference that concern over the workload of the Quality Assurance Department was not the reason for On Lok's reduction of Violan's work schedule.

Other evidence in the record also creates an inference that Eng and Nunez's alleged concern for the QA Department's workload was pretext for their frustration with Violan's

disability and requested accommodations.  Even though Eng and Nunez complained that Violan could not handle her assignments, both testified that they did not know what she was working on during the months she worked within her restrictions.  Patten Supp. Decl., Ex. A at 27:10-24; Sommer Supp. Reply Decl., Ex. E at 85:7-23.  Nunez also admitted that although she was responsible for assigning work to the QA Associates, she never discussed with Violan or otherwise informed her that other employees were taking on her assignments.  Patten Supp. Decl., Ex. A at 21:7-23:19.  Furthermore, Violan had a fraught relationship with both managers.  Violan alleges that Dr. Eng berated, embarrassed, and harassed her, and that Nunez's criticism and demands caused her anxiety.  FAC ¶¶ 17-19; 32; Middleton Decl. ¶ 6.

These facts strengthen an inference that Nunez and Eng may have targeted Violan based on her disability.  While ultimately the strength of this inference remains to be tested, it is not unreasonable and is supported by the record.  Under the summary judgment standard, courts "do not consider whether a jury could find in favor of the defendant," but rather only grant summary judgment "if a jury could *not* find for the plaintiff."  *Wong*, 192 F.3d at 821 (emphasis added). Violan has raised an issue of triable fact whether On Lok's proffered explanation is "unworthy of credence."  *Tex. Dep't. of Cmty. Affairs*, 450 U.S. at 256.  Therefore, whether On Lok's reason for the adverse employment action is a pretext for discrimination turns on issues of fact that cannot be resolved on a motion for summary judgment.

## II.   SIXTH AND SEVENTH CAUSES OF ACTION: FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS AND FAILURE TO ACCOMMODATE UNDER FEHA

"The standard for FEHA violations for failure to engage in the interactive process tracks the standard for ADA violations."  *Halsey v. JP Morgan Chase Bank*, No. 08-01335, 2009 WL 3353459 at *7 (N.D. Cal. Oct. 16, 2009).  Under FEHA, it is an unlawful employment practice for "an employer to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition."  CAL. GOV'T CODE § 12940(n).  FEHA requires that employers and employees engage in a good-faith interactive process to explore reasonable

United States District Court
Northern District of California

15

1    accommodation.  *Velente-Hook v. Easter Plumas Health Care*, 368 F.Supp.2d 1084, 1097 (E.D.

2    Cal. 2005).

3         "The interactive process is a mandatory rather than a permissive obligation on the part of

4    employers under the ADA." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000).  This

5    obligation is "triggered by an employee . . . giving notice of the employee's disability and the

6    desire for accommodation."  *Barnett*, 228 F.3d at 1114 .  The process requires good faith

7    communication by both parties as a means of achieving the shared goal of identifying an

8    accommodation that would enable the employee to perform his job effectively.  *Id.*  "Employers,

9    who fail to engage in the interactive process in good faith, face liability for the remedies imposed

10   by the statute if a reasonable accommodation would have been possible."  *Humphrey v. Mem'l*

11   *Hosps. Ass'n*, 239 F.3d 1128, 1137-38 (9th Cir. 2001).  In order to prevail on his claim alleging a

12   failure to accommodate, Violan bears the initial burden to show the existence of a reasonable

13   accommodation.  *Zukle v. Regents of University of California*, 166 F.3d 1041, 1046 (9th Cir.

14   1999).  However, "[o]nce an employer becomes aware of the need for accommodation, that

15   employer has a mandatory obligation under the ADA to engage in an interactive process with the

16   employee to identify and implement appropriate reasonable accommodations."  *Humphrey*, 239

17   F.3d at 1137.  Although the employee generally bears the burden of initiating the interactive

18   process, the burden falls on the employer "where the employer is aware of or recognizes the

19   employee's need for accommodation."  *Halsey,* 2009 WL 3353459 at *7.

20        The question of reasonable accommodation is ordinarily a question of fact.  *EEOC v. UPS*

21   *Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010); *Wong v. Regents of the Univ. of*

22   *Cal.*, 192 F.3d 807, 818 (9th Cir. 1999) ("Because the issue of reasonableness depends on the

23   individual circumstances of each case, this determination requires a fact-specific, individualized

24   analysis of the disabled individual's circumstances . . . .").  If the employer fails to engage in the

25   interactive process, summary judgment is only available to the employer "if a reasonable finder of

26   fact must conclude that there would in any event have been no reasonable accommodation

27   available."  *Dark*, 451 F.3d at 1088 (internal quotation marks and citation omitted).

28        There is no dispute that On Lok was aware of Violan's disability and work restrictions.

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    From September 2010 to February 2011, On Lok provided Violan accommodations including

2    physical therapy, an ergonomic work station, frequent stretch breaks, and a modified work

3    schedule restricting keyboarding to 50 percent of her duties.  In late January and early February

4    2011, On Lok decided to reduce Violan's work schedule from full-time to part-time.  Violan was

5    not consulted before or after On Lok decided to reduce her schedule.  On Lok prepared a memo

6    outlining Violan's modified work schedule.  Sandra Nunez, as Violan's supervisor, was

7    responsible for accommodating Violan properly.  Patten Supp. Decl., Ex. A at 102:8-18.  Nunez

8    read the memo to Violan "verbatim," but she did not explain or discuss the changes.  Patten Decl.

9    Ex. A at 226:7-227:25; Patten Decl. Ex. AA; Patten Supp. Decl. Ex. F at 91:21.  When Violan

10   asked Nunez a question regarding the modification, Nunez told her to "refer to the memo."  Patten

11   Decl., Ex. Z.  Additionally, Nunez stated that the modifications were not "open for discussion."

12   Patten Decl., Ex. AA.  When Violan recommended alternative accommodations, such as working

13   in another department or performing work that did not require a computer, Nunez stated that was

14   "not possible."  Patten Decl., Ex. A at 124:3-6.  Dr. Eng, the QA Department Manager, was

15   unaware that Violan even had any concerns.  Patten Decl., Ex. G at 96:4-8.

16          The evidence demonstrates that On Lok unilaterally and summarily modified Violan's

17   work schedule.  There is evidence that On Lok personnel, particularly her direct supervisor Nunez,

18   failed to meaningfully communicate with Violan regarding the modification or other possible

19   accommodations.  Violan was not told that there was anything unsatisfactory about the previous

20   accommodation, which was in existence for three months.  Accordingly, Violan has provided

21   sufficient evidence to create a triable issue whether On Lok failed to engage in the interactive

22   process.

23          Because there is a triable issue whether On Lok failed to engage in the interactive process,

24   summary judgment is only available to On Lok on the failure to accommodate claim "if a

25   reasonable finder of fact must conclude that there would in any event have been no reasonable

26   accommodation available."  *Dark*, 451 F.3d at 1088 (emphasis in original) (internal quotation

27   marks and citation omitted).  As discussed above, there are triable issues of fact whether Violan

28   could satisfactorily perform her job duties with her keyboarding restrictions.  Therefore, the Court

17

1    cannot find that a reasonable juror must conclude that no reasonable accommodation was

2    available.  On Lok contends that Violan's claim should be denied because she refused On Lok's

3    alleged accommodation of a part-time schedule and went on medical leave shortly thereafter.

4    However, "[s]ince Plaintiff has raised an issue of triable fact whether Defendant's proposed

5    modified schedule was a reasonable accommodation, the Court cannot grant summary judgment

6    on the basis that Defendant provided Plaintiff with a reasonable accommodation which she

7    subsequently refused."  *Sabido v. Walgreen's Drugs*, No. 03-2857, 2005 WL 522078 (N.D. Cal.

8    Mar. 2, 2005).  The Court denies On Lok's motion on the claims for failure to accommodate and

9    failure to engage in the interactive process.

10   **III. THIRD AND FOURTH CAUSES OF ACTION: RETALIATION UNDER ADA AND**

11       **FEHA**

12          Violan alleges that On Lok retaliated against her, in violation of the ADA and FEHA, for

13   three activities: (1) making an internal complaint to Sandra Nunez on August 11, 2010; (2) filing a

14   workers' compensation claim on September 24, 2010; and (3) filing a second workers'

15   compensation claim on October 18, 2010.  FAC ¶ 60.  Violan alleges a retaliation claim only

16   under FEHA for seeking accommodations pursuant to her doctor's recommendations regarding

17   workplace modifications.  FAC ¶ 67.

18          To establish a prima facie case of retaliation under the ADA or FEHA, an employee must

19   show that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment

20   action; and (3) there was a causal link between the two.  *Brown v. City of Tucson*, 336 F.3d 1181,

21   1186–87 (9th Cir. 2003).  Even if an employee can establish a prima facie case, however, if the

22   employer offers legitimate reasons for the adverse employment action, the burden shifts back to

23   the employee to demonstrate a triable issue of fact that such reasons are pretextual.  *Brooks v. City*

24   *of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  Mere temporal proximity between protected

25   conduct and the adverse action is inadequate to create a triable issue where the employer produces

26   evidence of a legitimate, non-discriminatory reason for the actions.  *Nadaf–Rahrov*, 166 Cal.App.

27   4th at 990.

28          Under FEHA, requesting accommodations is not "protected activity" unless the plaintiff

United States District Court
Northern District of California

18

first makes a complaint regarding the denial of accommodations.  *Alcala v. Best Buy Stores, LP*, No. 11-00798, 2012 WL 6138332 at *11 (C.D. Cal. Nov. 7, 2012) ("[plaintiff]'s first protected activity --his request for disability accommodations-- is not a FEHA-protected activity and cannot be the basis for this action"); *Kelley v. Corr. Corp. of Am.*, 750 F. Supp. 2d 1132, 1144 (E.D. Cal. 2010) ("The interpretation of "protected activity" that Plaintiff urges would significantly blur and perhaps obliterate the distinction between an action for failure to accommodate or engage in the interactive process and retaliation."); *Flait v. N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 476 (1992) (discussing need for employee to raise discrimination or harassment issues or oppose such activities as first step in analysis).  Violan has not provided evidence demonstrating that she made a complaint regarding denied accommodations before February 2011, when On Lok reduced her work schedule from full-time to part-time.  Violan contends that her October 8, 2010, email to Nunez, Eng, and Phillips constitutes a complaint regarding On Lok's failure to accommodate. Opp. at 9.  In that email, Violan stated that she would do her best to complete a data entry assignment by the deadline, but that it was likely not possible due to her injuries and twice weekly physical therapy sessions.  Patton Decl., Ex. F.  This email does not request any accommodations, nor does it state that she was unsatisfied with the accommodations provided.  Therefore, her claim for retaliation for requesting accommodations fails as a matter of law.

Violan's activities of filing a complaint with Sandra Nunez and filing workers' compensation claims, on the other hand,  would qualify as "protected activity" under the FEHA and ADA.  Protected activities include opposing an unlawful employment practice, participating in a statutorily authorized proceeding, and filing a complaint for violations arising under the ADA and FEHA.  *E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 303 F.3d 994, 1005 (9th Cir.2002); CAL. GOV'T CODE § 12940(h) (West 2006).  A "[p]laintiff's assertion that he filed a workers' compensation claim sufficiently alleges a protected activity for purposes of a FEHA claim." *Names v. Lee Publications, Inc.*, No. 09-0132, 2009 WL 3008296 at *3 (S.D. Cal. Sept. 21, 2009); *Vogel v. Dollar Tree Stores, Inc.*, No. 07–2275, 2008 WL 149234, at * 4 (E.D. Cal. Jan.14, 2008) (same).

In order to assert a successful retaliation claim, however, these protected activities must be

United States District Court
Northern District of California

1   causally linked to the reduction of Violan's work schedule in February 2011. "Causation

2   sufficient to establish the third element of the prima facie case may be inferred from circumstantial

3   evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and

4   the proximity in time between the protected action and the allegedly retaliatory employment

5   decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). While "causation can be

6   inferred from timing alone," such an inference can only be made if the adverse action occurred

7   "on the heels" of protected activity. *Villiarimo*, 281 F.3d at 1065.

8          Violan presents no circumstantial evidence that the reduction to part-time was motivated

9   by her complaint to Nunez or the workers' compensation claims. The reduction did not occur

10  until six months after Violan complained to Nunez on August 11, 2010, and four months after she

11  filed her workers' compensation claims on September 24, 2010 and October 18, 2010. The

12  passage of time between the alleged protected act and the alleged adverse action precludes

13  drawing an inference of retaliation. *See, e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268,

14  273 (2001) (per curiam) (noting that a court may not infer causation from temporal proximity

15  unless the time between an employer's knowledge of protected activity and an adverse

16  employment action is "very close" and citing cases for the proposition that a three-month and

17  four-month time lapse is insufficient to infer causation). Without more, there is insufficient

18  evidence of a nexus between these protected activities and the adverse employment action,

19  particularly given the evidence that On Lok's conduct was motivated by Violan's alleged inability

20  to do as much keyboarding as her job required. *See McGinest v. GTE Service Corp.*, 360 F.3d

21  1103, 1124 (9th Cir. 2004) (affirming grant of summary judgment for retaliation claim where

22  plaintiff had proffered no evidence of a causal link between the protected activity and denial of

23  promotion). Accordingly, the Court finds that Violan's retaliation claims fail as a matter of law.

24  **IV. FIFTH CAUSE OF ACTION: RETALIATION IN VIOLATION OF CAL. LABOR**

25  **CODE § 132A**

26          Violan asserts that she was retaliated against in violation of California Labor Code § 132a,

27  which makes it unlawful for an employer to discriminate against an employee in retaliation for

28  filing a workers' compensation claim. The California Supreme Court has held that the Workers'

1    Compensation Appeals Board is the exclusive forum for claims brought under § 132a.  *City of*

2    *Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1156-58 (1998).  Accordingly, the Court dismisses

3    this claim.

4    **V.   EIGHTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL**

5           **DISTRESS**

6           In order to establish intentional infliction of emotional distress, Violan must show

7    outrageous conduct by On Lok.  *Heller v. Pillsbury Madison & Sutro*, 50 Cal.App.4th 1367, 1388,

8    58 Cal. Rptr. 2d 336 (1996).  To be outrageous, the conduct must be so extreme as to "exceed all

9    bounds of that usually tolerated in a civilized society."  *King v. AC & R Adver.*, 65 F.3d 764, 770

10   (9th Cir. 1995) (internal quotation marks omitted and citation).  "Summary judgment is proper if a

11   claim cannot reasonably be regarded as so extreme and outrageous as to permit recovery."  *Id.*

12   (internal quotation marks and citations omitted).  Violan's claim is based on "the manner in which

13   [On Lok] failed to engage in the interactive process . . . ."  FAC ¶ 104. This activity cannot

14   support a claim for intentional infliction of emotional distress.  *See Janken v. GM Hughes*

15   *Electronics*, 46 Cal. App. 4th 55, 80, 53 (1996) ("Managing personnel is not outrageous conduct

16   beyond the bounds of human decency, but rather conduct essential to the welfare and prosperity of

17   society . . . A simple pleading of personnel management activity is insufficient to support a claim

18   of intentional infliction of emotional distress, even if improper motivation is alleged.  If personnel

19   management decisions are improperly motivated, the remedy is a suit against the employer for

20   discrimination."); *Walker v. Boeing Corp.*, 218 F.Supp.2d 1177, 1190 (C.D. Cal. 2002)

21   ("Terminating an employee for improper or discriminatory reasons, like many adverse personnel

22   management decisions, is insufficiently extreme or outrageous to give rise to a claim for

23   intentional infliction of emotional distress.").

24          Violan has not submitted any evidence demonstrating the existence of a question of fact

25   regarding whether On Lok engaged in "outrageous" conduct necessary for a claim of intentional

26   infliction of emotional distress.  The Court therefore grants On Lok's motion for summary

27   judgment on this claim.

28

United States District Court
Northern District of California

21

United States District Court
Northern District of California

## VI. NINTH CAUSE OF ACTION: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY[3]

On Lok moves for summary judgment on Violan's wrongful termination in violation of public policy claim on the basis that she has failed to raise a triable issue of fact with respect to any of her ADA or FEHA claims.  An employer's discharge of an employee in violation of a fundamental public policy embodied in a constitutional or statutory provision can give rise to a tort action.  *Barton v. New United Motor Manufacturing*, Inc., 43 Cal. App. 4th 1200, 1205, 51 Cal. Rptr. 2d 328 (1996).  In order to sustain a claim of wrongful termination in violation of public policy, a plaintiff must prove that her dismissal violated a policy that is fundamental, beneficial for the public, and embodied in a statute or constitutional provision.  *Turner v. Anheuser-Busch, Inc*. 7 Cal.4th 1238, 1256 (1994).  Under California law, terminating an employee because of her disability or in retaliation for complaining of discriminatory conduct is sufficient to support a claim for wrongful termination in violation of public policy.  *City of Moorpark*, 18 Cal. 4th at 1158-61.  As set forth above, Violan has raised triable issues of fact regarding her claims under the ADA and FEHA, so she also has a claim for wrongful termination in violation of public policy.

On Lok contends that Violan cannot maintain a wrongful termination claim because she was not actually terminated and remains on an extended medical leave of absence.  Violan asserts that her medical leave of absence is "constructive termination," which traditionally requires a showing that "the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign."  *Turner v. Anheuser–Busch, Inc*., 876 P.2d 1022, 1029 (1994).  Courts have denied summary judgment on constructive termination claims where the plaintiff has not formally resigned and is on an extended medical leave of absence.  *White v. Honeywell, Inc*., 141 F.3d 1270, 1279 (8th Cir. 1998) ("We are not prepared to say that 'quit' is the magic word in a constructive discharge instruction.  A person who has suffered a forced unpaid medical leave of

---

[3] This cause of action is titled "Intentional Infliction of Emotional Distress" but the substance of the cause of action alleges wrongful termination in violation of public policy.

1   absence, from which she is unable to return and which resulted from objectively intolerable

2   working conditions, is in no better position than one who was forced to quit as a result of

3   objectively intolerable conditions."); *Siraj v. Bayer Healthcare LLC*, No. 09-00233, 2010 WL

4   889996 (N.D. Cal. Mar. 8, 2010) (denying summary judgment on constructive discharge claim

5   where plaintiff "remains on medical leave of absence until she is able to perform the essential

6   functions of her position"); *Llewellyn v. Celanese Corp.*, 693 F. Supp. 369, 381 (W.D.N.C. 1988)

7   ("Even though Ms. Llewellyn did not quit, her medical leave without pay was caused by her

8   intolerable work situation.").  Therefore, although Violan did not technically resign, whether this

9   arrangement constitutes constructive termination is a triable issue of fact that survives summary

10  judgment.

**VII.   PUNITIVE DAMAGES**

12          Finally, On Lok argues that even if Violan can raise triable issues with respect to her

13  claims for disability discrimination, she cannot demonstrate sufficient facts to support an award of

14  punitive damages.  Mtn. at 22.  Under FEHA, "[b]ecause Defendant is a corporation, the evidence

15  must demonstrate an officer, director or managing agent of Defendant committed, authorized or

16  ratified an act of malice, oppression or fraud to create a genuine issue of material fact on punitive

17  damages." *Yeager v. Corr. Corp. of Am.*, 944 F. Supp. 2d 913, 931 (E.D. Cal. 2013).  Under the

18  FEHA and the ADA, "[a] complaining party may recover punitive damages . . . if [she]

19  demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices

20  with malice or with reckless indifference to the federally protected rights of an aggrieved

21  individual."  42 U.S.C. § 1981a(b)(1); CAL. CIV. CODE § 3294(b).

22          Violan alleges that QA Department Manager Sandra Nunez, QA Department Supervisor

23  Dr. Catherine Eng, and Chief Medical Officer Dr. Cheryl Phillips took an adverse employment

24  action against her when they decided to reduce her schedule to part-time.  Violan asserts that

25  Phillips and Eng "were actively involved in making the decision to effectively terminate [Violan]

26  and would have the authority for setting the policies at On Lok."  Opp. at 24.  On Lok does not

27

28

United States District Court
Northern District of California

1   respond to this assertion. [4]   Reply Br. at 9.

2          Neither party cites to any evidence supporting their arguments.  However, a review of the

3   record indicates that a reasonable trier of fact could conclude that a managing agent of On Lok

4   was involved in the decision to reduce Violan's schedule.  Whether an individual is a "managing

5   agent" does "not depend on employees' managerial level, but on the extent to which they exercise

6   substantial discretionary authority over decisions that ultimately determine corporate policy. Thus,

7   supervisors who have broad discretionary powers and exercise substantial discretionary authority

8   in the corporation could be managing agents." *Id*.  Even "lower-level employees may be found to

9   possess broad supervisory and decisionmaking authority where the authority exercised by the

10  employees necessarily results in the ad hoc formulation of policy." *Rangel v. Am. Med. Response*

11  *W.*, No. 01467, 2013 WL 1785907 at *29 (E.D. Cal. Apr. 25, 2013) (citation and alternations

12  omitted).

13         Phillips initiated the discussion in January 2011 regarding whether to reduce Violan's

14  schedule to part-time.  Middleton Decl., Ex D.  Phillips made the recommendation to "reduce her

15  time to 50% and bring in a temp." *Id*.  She also stated that she "would look to Dr. Eng - since it is

16  under her direct supervision." *Id*.  Eng responded, "Before making a decision, I would like to

17  discuss this with Sandra [Nunez] and Dr. Phillips at our 1:1 meetings this week." *Id*.  Phillips,

18  Eng, and Nunez met to discuss modification of Violan's work hours and drafted the memorandum

19  outlining their decision to reduce her schedule to part-time. *Id*.  Therefore, it appears that Phillips,

20  Eng, and Nunez exercised broad discretion in creating an ad hoc policy on how to handle Violan's

21  work restrictions. *Ginda v. Exel Logistics, Inc*., 42 F. Supp. 2d 1019, 1023 (E.D. Cal. 1999)

22  (finding that manager who "exercised broad discretion in the disposition of plaintiff's claim" was a

23  managing agent for purposes of FEHA).  There is no evidence suggesting that any higher-level

24  management employees at On-Lok were involved in the decision. *Cf. Kelly-Zurian v. Wohl*, 22

25

26  [4] Nunez's declaration conclusorily states that she did not have authority for setting the policies of
    On Lok and was not designated as a corporate officer.  Nunez Decl. ¶ 12.  Middleton's declaration
27  states that she is not a corporate officer of On Lok, but it is silent on whether she had authority to
    set policies.  Middleton Decl. ¶ 18.  Such "uncorroborated and self-serving" testimony cannot
28  create a genuine issue of fact. *Kennedy v. Applause, Inc*., 90 F.3d at 1481.  On Lok has not
    provided declarations for Phillips or Eng.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Cal. App. 4th 397, 421-22 (1994) (finding that supervisor who possessed authority to terminate

2   plaintiff's employment was not a "managing agent" where management employees above the

3   defendant administrator exercised their discretionary authority regarding the handling of her

4   complaints.)  Accordingly, there is a genuine issue of fact whether a managing agent of On Lok

5   participated in an adverse employment action against Violan.

6          Violan has also presented evidence that her supervisors acted with deliberate indifference

7   by unilaterally changing her schedule, failing to explain the modified work schedule, and

8   summarily refusing to consider other possible accommodations.  Additionally, the evidence

9   supports an inference that Nunez and Eng acted with malice.  Violan alleges that Eng berated,

10  embarrassed, and harassed her in meetings.  FAC ¶¶ 17-19.  Nunez's criticisms and allegedly

11  unreasonable work demands made her feel depressed, anxious, and "belittled."  Middleton Decl.,

12  Ex. G.  Due to Nunez and Eng's actions, a workers' compensation physician diagnosed Violan

13  with "situational anxiety" caused by work-related stress and placed her on medical leave.  FAC ¶

14  32; Middleton Decl. ¶ 6.  Accordingly, summary judgment on Violan's prayer for punitive

15  damages is denied.

16  **VIII.   THE PARTIES' EVIDENTIARY OBJECTIONS**

17         The parties object to each other's evidence for several reasons, the majority of which

18  concern authentication.  A court can only consider admissible evidence in ruling on a motion for

19  summary judgment.  FED. R. CIV. P. 56(e); *Beyene v. Coleman Sec. Servs*., Inc., 854 F.2d 1179,

20  1181 (9th Cir. 1988).  Authentication is a "condition precedent to admissibility," and this

21  condition is satisfied by "evidence sufficient to support a finding that the matter in question is

22  what its proponent claims."  FED. R. EVID. 901(a).  Unauthenticated documents cannot be

23  considered in a motion for summary judgment.  *Cristobal v. Siegel*, 26 F.3d 1488, 1494 (9th Cir.

24  1994).

25         **A.  Violan's Objections**

26         Violan objects to the authenticity of several declarations of On Lok employees submitted

27  in support of On Lok's Motion for Summary Judgment on the basis that the declarations do not

28  state that they are made on personal knowledge.  Federal Rule of Civil Procedure 56(e) requires

1    that affidavits be made on personal knowledge, that the affiant be competent to testify to the

2    matters stated therein, and that sworn or certified copies of all papers referred to in an affidavit be

3    attached thereto.  FED. R. CIV. P. 56(e).  "When a declarant necessarily has first-hand knowledge

4    of the facts contained in an affidavit by virtue of his or her position of employment, personal

5    knowledge may be inferred."  *United States v. Real Prop. Located at 475 Martin Lane, Beverly*

6    *Hills California*, 298 F. App'x 545, 551 (9th Cir. 2008).  *Self-Realization Fellowship Church v.*

7    *Ananda Church of Self-Realization*, 206 F.3d 1322, 1330 (9th Cir. 2000) (corporate officer's

8    knowledge of identity of employees and their tasks can be presumed).  Each declaration states the

9    employee's name, position at the company, and swears to the truth of the matters in the

10   declaration.  Therefore, the On Lok employees' personal knowledge and competence to testify are

11   reasonably inferred from their positions at the company and the nature of their participation in the

12   matters to which they swore.

13        Violan also objects to the use of excerpts of her deposition taken in a workers'

14   compensation proceeding.  The excerpts are attached to the declaration of Brian Ito, the attorney

15   who took the deposition.  "A deposition or an extract therefrom is authenticated in a motion for

16   summary judgment when it identifies the names of the deponent and the action and includes the

17   reporter's certification that the deposition is a true record of the testimony of the deponent."  *Orr*

18   *v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002).  *See* FED. R. EVID. 901(b); FED. R.

19   CIV. P. 56(e) & 30(f)(1).  The declaration of Brian Ito and the deposition excerpts submitted

20   satisfy these requirements, and are therefore admissible.  The deposition testimony also falls under

21   the hearsay exception for an opposing party's statement under Rule 801(d)(2).  *See* Fed. R. Evid.

22   801(d)(2).

23        **B.  On Lok's Objections**

24        On Lok objects to the authenticity of exhibits attached to the Declaration of Dow Patten in

25   Support of Plaintiff's Opposition to the Motion for Summary Judgment.  On Lok asserts that a

26   witness who has personal knowledge of the documents has not authenticated the documents.  This

27   objection is unavailing because Patten's declaration identified that On Lok produced the exhibits.

28   Documents produced by a party in discovery are deemed authentic when offered by the party-

opponent.  *Orr,* 285 F.3d at 776.  *See also Maljack Prods., Inc. v. GoodTimes Home Video Corp*.,

81 F.3d 881, 889 n. 12 (9th Cir. 1996) (documents produced by a party in discovery deemed

authentic when offered by the party-opponent); 31 Federal Practice & Procedure: Evidence §

7105, at 39 ("Authentication can also be accomplished through judicial admissions such as . . .

production of items in response to . . .  [a] discovery request.").  The exhibits are therefore

admissible.

        On Lok also objects to the deposition excerpts attached to the Declaration of Dow Patten in

Support of Plaintiff's Renewed Opposition, on the basis that they were not submitted with court

reporter's certifications.  However, On Lok cites to and includes excerpts from the same

depositions in support of its brief, and has properly authenticated the depositions with the court

reporters' certificates.  "When a document has been authenticated by a party, the requirement of

authenticity is satisfied as to that document with regards to all parties . . . ."  *Orr,* 285 F.3d at 776.

*See also* 31 Wright & Gold, Federal Practice & Procedure: Evidence § 7104 at 30-31 (2000)

("Once evidence offered against one party is deemed authentic, its authenticity is established as

against all other parties as well.").  The Ninth Circuit has held that a district court's admission of

unauthenticated evidence in a summary judgment motion is harmless error when the same item of

evidence has been authenticated by an opposing party.  *Cristobal v. Siegel*, 26 F.3d 1488, 1494

(9th Cir. 1994).  Therefore, the Court finds that the deposition excerpts are admissible.[5]

**CONCLUSION**

        For the reasons above, the defendant's Motion for Summary Judgment is GRANTED on

the plaintiff's Third, Fourth, and Fifth Causes of Action for retaliation and the Eighth Cause of

Action for intentional infliction of emotional distress.

---

[5] On December 18, 2013, Violan re-submitted the deposition excerpts and attached official
transcripts.

United States District Court
Northern District of California

1        The motion is DENIED on the First and Second Causes of Action for disability

2   discrimination, the Sixth Cause of Action for failure to engage in the interactive process, the

3   Seventh Cause of Action for failure to accommodate, the Ninth Cause of Action for wrongful

4   termination in violation of public policy, and the plaintiff's request for punitive damages.

5        **IT IS SO ORDERED**.

6   Dated: December 31, 2013



8   WILLIAM H. ORRICK
   United States District Judge

United States District Court
Northern District of California